UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
                                :

UNITED STATES OF AMERICA        :          08 Cr. 1210 (SCR)
                                :

        -against-           :
                                :

ROBERT GROEZINGER,        :
                                :

              Defendant.    :
                                :
-----------------------------------------------------x

# MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ROBERT GROEZINGER'S PRETRIAL MOTIONS

BRICCETTI, CALHOUN & LAWRENCE, LLP
81 Main Street, Suite 450
White Plains, NY  10601
(914) 946-5900

*ATTORNEYS FOR DEFENDANT*
*ROBERT GROEZINGER*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

POINT I:  THE SEARCH WARRANT IN THIS CASE WAS NOT SUPPORTED BY
PROBABLE CAUSE AND THE ITEMS SEIZED PURSUANT TO IT MUST BE
SUPPRESSED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A.      The Applicable Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

B.      Lack of Probable Cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

C.      The Good Faith Exception Does Not Apply . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.      The Indicia of Probable Cause Was Sorely Lacking . . . . . . . . . . . . . . . . 16

        2.      The Magistrate Judge Was Knowingly or Recklessly Misled . . . . . . . . . . . . . 21

POINT II:  MR. GROEZINGER'S STATEMENTS SHOULD BE SUPPRESSED AS THE
FRUIT OF THE POISONOUS TREE AND FOR VIOLATION OF HIS *MIRANDA* RIGHTS  25

A.      The Statements Were the "Fruit of the Poisonous Tree" . . . . . . . . . . . . . . . . . . . . . 28

B.      The Statements Were Taken in Violation of *Miranda* . . . . . . . . . . . . . . . . . . . . . . . 28

POINT III:  THE PHYSICAL EVIDENCE OBTAINED FROM MR. GROEZINGER'S
FORMER TENANT SHOULD BE SUPPRESSED AS THE FRUIT OF THE POISONOUS
TREE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

POINT IV:  THE GOVERNMENT SHOULD BE REQUIRED TO MAKE DISCLOSURE
PURSUANT TO BRADY v. MARYLAND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

POINT V:  THE COURT SHOULD DIRECT THE GOVERNMENT TO MAKE CERTAIN
PRETRIAL DISCLOSURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

A.      Witness List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

B.      Exhibit List . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Page</u>

C.      Witness Statements and Impeachment Material  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D.      Rule 404(b) Evidence  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

E.      Completeness of Discovery  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

# **TABLE OF AUTHORITIES**

Page

CASES

Brady v. Maryland, 373 U.S. 83 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 33

Giglio v. United States, 405 U.S. 150 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Giordenello v. United States, 357 U.S. 480 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Illinois v. Gates, 462 U.S. 213 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23

Miranda v. Arizona, 384 U.S. 436 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Ornelas v. United States, 517 U.S. 690 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973),
    cert. denied, 516 U.S. 1182 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Ali, 68 F.3d 1468 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Battershell, 457 F.3d 1048 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

United States v. Brunette, 256 F.3d 14 (1st Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 18

United States v. Cannone, 528 F.2d 296 (2d Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Christie, 570 F.Supp.2d 657 (D.N.J. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 12

United States v. Coppa, 267 F.3d 132 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Earls, 2004 WL 350725, at *9 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . 34, 35

United States v. Eng, 971 F.2d 854 (2d Cir. 1992),
    cert. denied, 510 U.S. 1045 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Falkowitz, 214 F.Supp.2d 365 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . 34, 35

United States v. Falso, 544 F.3d 110 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 25

United States v. Genin, 594 F.Supp.2d 412 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 20

Page

United States v. George, 975 F.2d 72 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Jasorka, 153 F.3d 58, 60 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 10, 12, 17

United States v. Leon, 468 U.S. 897 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 21

United States v. LeRoy, 687 F.2d 610 (2d Cir. 1982),
        cert. denied, 459 U.S. 1174 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

United States v. Madrid, 302 F.Supp.2d 187 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Moore, 968 F.2d 216 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Morales, 280 F.Supp.2d 263 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . 35

United States v. Nachamie, 91 F.Supp.2d 565 (S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Newton, 369 F.3d 659 (2d Cir.),
        cert. denied, 543 U.S. 947 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

United States v. Pena, 961 F.2d 333 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Reddy, 190 F.Supp.2d 558 (S.D.N.Y. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 36

United States v. Rueb, 2001 WL 96177, at *7 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . 34

United States v. Ruggles, 70 F.3d 262 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

United States v. Santa, 180 F.3d 20 (2d Cir.),
        cert. denied, 528 U.S. 943 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Syphers, 426 F.3d 461 (1st Cir. 2005),
        cert. denied, 547 U.S. 1158 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

United States v. Travisano, 724 F.2d 341 (2d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

United States v. Turkish, 458 F. Supp. 874 (S.D.N.Y. 1978),
        aff'd, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981) . . . . . . . . . 34, 35

United States v. Ventresca, 380 U.S. 102 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Page

Weeks v. United States, 232 U.S. 383 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Wong Sun v. United States, 371 U.S. 471 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 28, 31, 32

Ybarra v. Illinois, 444 U.S. 85 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

## STATUTES

18 U.S.C. § 2252 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2256 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14, 22

18 U.S.C. § 3500 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Fed. R. Crim. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 34

Federal Rules of Evidence, Rule 611(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## OTHER

http://en.wikipedia.org/wiki/United_States_Customs_Service . . . . . . . . . . . . . . . . . . . . . . . . . . 18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x
UNITED STATES OF AMERICA  :   08 Cr. 1210 (SCR)
             :
   -against-     :
             :
ROBERT GROEZINGER,    :
             :
      Defendant. :
-------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT ROBERT GROEZINGER'S PRETRIAL MOTIONS

Defendant Robert Groezinger, by his attorneys, Briccetti, Calhoun & Lawrence, LLP,

submits this Memorandum of Law in support of his pretrial motions for an Order:

(1)  suppressing physical evidence seized from defendant's home, Fed. R. Crim. P.

12(b)(3);

(2)  suppressing defendant's statements, Fed. R. Crim. P. 12(b)(3);

(3)  suppressing physical evidence obtained from defendant's former tenant, Fed. R.

Crim. P. 12(b)(3);

(4)  directing the government to make disclosure pursuant to Brady v. Maryland, 373 U.S.

83 (1963);

(5)  directing the government to make certain pretrial disclosures, Fed. R. Crim. P. 16;

and

(6)  for such further relief as the Court may deem just and proper.

## FACTS

Robert Groezinger is charged in a two-count indictment with, respectively, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(2)(B) (Count One) and 2252A(a)(5)(B) (Count Two).  (Briccetti aff., Exh. A).[1]  Mr. Groezinger has pleaded not guilty to the indictment.

On September 8, 2008, pursuant to a search warrant issued by Magistrate Judge Lisa Margaret Smith (Exh. B), agents of the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), searched the defendant's home at 889 Route 311 in Patterson, New York, and seized a Dell laptop computer and a Cruzer 1.0 GB thumbdrive.  They also seized numerous compact discs and floppy discs, a second thumbdrive, and miscellaneous documents.  While the search was in progress, the agents questioned Mr. Groezinger.  (Exh. E). The agents did not provide Mr. Groezinger with Miranda warnings prior to the interrogation. Although he was not arrested at that time, Mr. Groezinger was not free to leave during this interview.  (Groezinger aff., ¶¶ 2-7).

The search warrant had been issued on September 4, 2008, based on the affidavit of ICE Special Agent Leonard Bogdanski.  Bogdanski said he had been an ICE agent for 13 years and that his duties included the investigation of child pornography cases.  The affidavit contains no information regarding any particular credentials, qualifications, training or expertise Bogdanski had with respect to the determination of what types of images or materials constitute child pornography.

---

[1] All of the exhibits to which this memorandum refers are attached to the accompanying Affirmation of Vincent L. Briccetti.

The affidavit is 30 pages in length.  Most of it contains "boilerplate" information – i.e., information not specific to Mr. Groezinger or the premises to be searched – about the Internet, computers, the use of the Internet and computers for child pornography, child pornography collector characteristics, and the methods to be used to search for computerized information.  The particular investigation here and the evidence that had been gathered is described in approximately four pages, as summarized below.

According to Agent Bogdanski, ICE agents had arrested an individual in California (the "Perpetrator") on charges of receipt and distribution of child pornography.  Perpetrator had used an Internet chatroom service called "Google Hello" to send and receive instant messages as well as images containing child pornography.  (Exh. B, ¶ 8).  From evidence recovered from Perpetrator's computer, the agents had identified several individuals who communicated with Perpetrator via Google Hello and received or distributed child pornography during those online communications.  (Exh. B, ¶ 9).

According to the affidavit, one such individual, who utilized the username "picluverinusa," engaged in chats with Perpetrator in December 2007 and January 2008.  The affidavit states that "picluverinusa" both received and distributed images containing child pornography.  (Exh. B, ¶ 10).  The affidavit also states that on December 21, 2007, "picluverinusa" contacted Perpetrator by instant messaging and "stated that he/she liked 'anything young and cute no age prefs.'" The affidavit further states that "Perpetrator sent 'picluverinusa' in excess of 10 images, which were subsequently recovered from the Perpetrator's computer and many of which contain child pornography."  (Exh. B, ¶ 10(a)).

-3-

The affidavit also states that on January 19, 2008, "picluverinusa" contacted Perpetrator by instant messaging and "sent in excess of 15 images, which were subsequently recovered from the Perpetrator's computer and many of which contain child pornography."  (Exh. B, ¶ 10(b)).

The affidavit does <u>not</u> say whether Agent Bogdanski personally reviewed the images recovered from Perpetrator's computer before seeking the search warrant, or whether he was instead relying on what he was told by other ICE agents.  The affidavit does refer to other ICE agents who had identified the individuals who communicated with Perpetrator, including "picluverinusa," suggesting that Agent Bogdanski did not personally review the images.  (Exh. B, ¶¶ 9-10).

In addition, the affidavit does not attach the images allegedly recovered from Perpetrator's computer which were sent to or received from "picluverinusa."  Nor does the affidavit provide any description of the images, other than to say that many of them contained child pornography.  The affidavit makes reference to the statutory definitions of "child pornography" and "sexually explicit conduct" (Exh. B, ¶ 5), but it does not identify which of the several categories of "sexually explicit conduct" the images allegedly depicted.

By letter dated December 17, 2008, the government provided discovery in this case.  The discovery letter made available for inspection "[a]pproximately 26 images containing child pornography sent to picluverinusa from the California Perpetrator" during the online chats.  However, the letter makes no reference at all to any images containing child pornography sent by "picluverinusa" to Perpetrator, despite the warrant affidavit's claim that "picluverinusa" sent in excess of 15 such images.  (<u>Compare</u> Exh. C, p. 2, <u>with</u> Exh. B, ¶ 10(b)).  Defense counsel has personally inspected all of the images contained in the online chats.  None of the images sent by

"picluverinusa" to Perpetrator appears to contain child pornography.  (Briccetti aff., ¶ 5).  This

fact is consistent with the government's discovery letter but is directly contrary to the agent's

sworn statements in the warrant affidavit.

The affidavit attempts to connect the username "picluverinusa" to Mr. Groezinger as

follows:  It states that Google records show that "'picluverinusa' was associated with the email

address 'picluver@yahoo.com', which was accessed via a Comcast Internet connection using the

IP address 67.189.184.170." (Exh. B, ¶ 11; Exh. D).[2]  It further states that according to Comcast

records IP address 67.189.184.170 was assigned from November 2, 2007, to March 5, 2008, to

an Internet account in Mr. Groezinger's name at 889 Route 311 in Patterson (Exh. B, ¶ 12), and

that the email address picluver@yahoo.com was created on April 5, 2007, using a different IP

address 67.189.144.89.  (Exh. B, ¶ 13). According to the affidavit, that email address is

subscribed to by someone named "Mr pic luver" with an address in Catskill, New York, where

Mr. Groezinger's estranged wife owned a home.  (Exh. B, ¶ 13).

Notably, although Google records produced in discovery show that "picluverinusa"

accessed the Internet via the IP address 67.189.184.170, those records do not show any access on

the key dates referred to in the affidavit – December 21, 2007, and January 19, 2008 (the dates

when picluverinusa and Perpetrator allegedly exchanged child pornography).  This fact was not

shared with the magistrate judge.  Indeed, the first "access" date listed in the Google records is

January 15, 2008, which is several weeks after the first alleged chat between Perpetrator and

---

[2]  The warrant affidavit explains that an IP (Internet Protocol) address is a multi-digit
number assigned by an Internet Service Provider (e.g., Comcast) to each of its users accessing the
Internet, and that the IP address is required for the user to gain access to websites or transmit files
to other Internet users.  (Exh. B, ¶ 6(b)).

"picluverinusa" on December 21, 2007.  As to the second alleged chat on January 19, 2008, the

Google records do show access before and after January 19, 2008, but not <u>on</u> January 19, 2008.

(Exh. D).

Moreover, the email address picluver@yahoo.com was apparently created using a

different IP address (67.189.144.89) than the one assigned to Mr. Groezinger's Internet account

(67.189.184.170).  The affidavit states, without explanation of its significance, that the

67.189.144.89 address is "part of a block of IP numbers that are assigned by Comcast."[3]

Finally, the affidavit states that Mr. Groezinger received mail at 889 Route 311, that he

resided there in December 2007 and January 2008, that one other person received mail at that

address, that the utility company listed Mr. Groezinger as the account holder at that address, and

that a person resembling Mr. Groezinger's passport photo was seen outside the residence in

2008.  (Exh. B, ¶¶ 14-16).

In its discovery letter, the government made disclosure of one statement attributed to Mr.

Groezinger.  The letter states that "[a]t the time of the search, the defendant told agents, in

substance, that he had gotten rid of his old computer because 'the motherboard fried.'" (Exh. C,

p. 2).  As noted above, the agents did not provide Mr. Groezinger with <u>Miranda</u> warnings prior to

questioning him.  The facts relating to the agents' questioning of Mr. Groezinger are set forth in

his accompanying affidavit.  In summary, Mr. Groezinger's movements were restrained during

the course of the search, the agents positioned themselves to block Mr. Groezinger from leaving,

and they never told Mr. Groezinger that he was free to leave.  When Mr. Groezinger said he

---

[3]  The affidavit also states that "[t]his email address was provided to register Google
Hello username 'picluver@yahoo.com.'"  This statement makes no sense because
picluver@yahoo.com is an email address, not a username.

needed to make a 7:00 a.m. train from Patterson in order to be on time for a court appearance in

Foley Square, the agents replied, in substance, that he was going to be late.  After that, Mr.

Groezinger knew he was not free to leave, and he expected to be arrested.  (Groezinger aff., ¶¶ 2-

7).  In discovery, the government provided a redacted ICE report summarizing Mr. Groezinger's

statements, including the statement that he had discarded his old computer because the

"motherboard had 'fried.'"  (Exh. E).

 During the course of his interview by ICE agents, Mr. Groezinger also provided the

names of the tenants in his basement apartment.  (Exh. E).  The government later interviewed

one of the tenants (William Mitchell), and obtained from him a Maxtor computer hard drive that

Mr. Mitchell said he had received from Mr. Groezinger after Mr. Groezinger "had problems with

the motherboard."  By letter dated January 20, 2009, the government alleges that one image

containing child pornography was found on that hard drive, along with documents related to Mr.

Groezinger's law practice.  (Exh. F).

 The government's December 17 discovery letter alleges that, in addition to the 26 child

pornography images found on the California Perpetrator's computer, the agents found (1)

approximately 6 deleted images and 6 Internet cache image files containing child pornography on

the Dell laptop computer seized from Mr. Groezinger's home; (2) approximately 30 deleted

images containing child pornography on the Cruzer thumbdrive seized from the home; and (3)

approximately 17 "url" links to images containing child pornography sent or received in online

chats found on the Dell laptop computer seized from the home.  (Exh. C).

## ARGUMENT

## POINT I

## THE SEARCH WARRANT IN THIS CASE WAS NOT SUPPORTED BY PROBABLE CAUSE AND THE ITEMS SEIZED PURSUANT TO IT MUST BE SUPPRESSED

The Court issued a search warrant on September 4, 2008, authorizing the search of Mr. Groezinger's home for child pornography and related items.  On September 8, 2008, ICE agents executed that warrant and seized a number of items, including the alleged child pornography upon which this prosecution is based.  However, because the warrant was not supported by probable cause, and because the "good faith" exception to the exclusionary rule does not apply, the warrant was invalid and the items seized pursuant to it must be suppressed.

A.    The Applicable Standard

A valid search warrant under the Fourth Amendment must be supported by probable cause.  There must be known facts and circumstances demonstrating a reasonable belief that a crime was committed and that "contraband or evidence of a crime will be found" in the place to be searched.  Ornelas v. United States, 517 U.S. 690, 696 (1996); United States v. Travisano, 724 F.2d 341, 346 (2d Cir. 1983).  The supporting affidavit must state "particularized facts" that allow the judge to draw the necessary inferences to find probable cause.  Giordenello v. United States, 357 U.S. 480, 485-86 (1958).  There must be sufficient information "presented to the [judge] to allow [the judge] to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others."  Illinois v. Gates, 462 U.S. 213, 239 (1983).   The court to which an application for a warrant is presented must not "serve merely as a rubber stamp for the police."  United States v. Ventresca, 380 U.S. 102, 109 (1965).  Rather, the court has to be

"neutral and detached" in its assessment of the application's sufficiency.  United States v. Travisano, 724 F.2d at 345.  Otherwise, the Fourth Amendment's guarantee that "no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation," cannot be realized.

As set forth below, the warrant application here lacks any indicia of probable cause. First, and most importantly, Agent Bogdanski's affidavit neither appends nor provides any description at all of the images contained in the Internet chats found in the California Perpetrator's computer.  Rather, the affidavit contains the bare conclusion that many of the images "contain child pornography."  Second, the affidavit does not even say whether Agent Bogdanski personally viewed the images seized from Perpetrator, and contains no information about his credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of his fellow ICE agents, with respect to the determination of what types of images or materials constitute child pornography.  Third, the affidavit contains no evidence whatsoever that "picluverinusa" had any interest in child pornography or any history of receiving or possessing child pornography.  And finally, the affidavit's evidence linking these images to the place to be searched – Mr. Groezinger's home – is extremely weak.  The search warrant application was wholly inadequate and thus did not justify the issuance of the warrant.

B.    Lack of Probable Cause

This Court recently held that, in a case in which the determination of probable cause turns on whether particular images linked to a suspect's home or computer contain child pornography, the warrant application must either append the images that allegedly constitute child pornography or include a reasonably detailed description of the allegedly proscribed material.  United States v. Genin, 594 F.Supp.2d 412 (S.D.N.Y. 2009).  In Genin, as in the instant case, the warrant

-9-

application stated that certain images[4] contained child pornography, without describing which

category of child pornography the images fell into.  "Child pornography" is defined as "any

visual depiction, including any . . . computer or computer-generated image or picture . . . of

sexually explicit conduct," 18 U.S.C. § 2256(8), and "sexually explicit conduct" is defined as

"actual or simulated (i) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or

masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person."  Id. §

2256(2)(A).

 The first four of the categories of sexually explicit conduct describe behavior that is

"clearly defined and easily recognized."  United States v. Genin, 594 F.Supp.2d at 420 (quoting

United States v. Jasorka, 153 F.3d 58, 60 (2d Cir. 1998), and citing cases).  The fifth category,

however – "lascivious exhibition of the genitals or pubic area" – is "'far more subjective and

open to interpretation,' due to the use of the ambiguous and imprecise term 'lascivious.'"  United

States v. Genin, 594 F.Supp.2d at 420 (quoting United States v. Battershell, 457 F.3d 1048, 1051

(9th Cir. 2006)).  Accord, United States v. Brunette, 256 F.3d 14, 18 (1st Cir. 2001) ("[T]he

identification of images that are lascivious will almost always involve, to some degree, a

subjective and conclusory determination on the part of the viewer.")

 The problem here is that the warrant application – as in Genin – neither appends the

images nor provides any description of the images, and does not specify which of the five

categories of "sexually explicit conduct" the images fall into.  It merely states that the images

allegedly exchanged between the California Perpetrator and "picluverinusa" "contained child

pornography."  (Exh. B, ¶ 10).  Therefore, there was no way for the magistrate judge to make an

---

[4]  In Genin, the images were on videotapes and DVDs.

independent legal conclusion that the images depicted either the conduct described in the first four categories of "sexually explicit conduct" or lascivious exhibition of the genitals or pubic area.  Without seeing the images themselves, or at least reviewing a reasonably detailed description of the images, the magistrate judge was being asked to rubber stamp the conclusions of the police.  Since "the probable cause determination is a nondelegable judicial duty," United States v. Genin, 594 F.Supp.2d at 421, and since the magistrate judge as a practical matter did not independently make the probable cause determination, the issuance of the warrant here was improper.

United States v. Brunette, a case decided by the First Circuit in 2001, is directly on point. In Brunette, a U.S. Customs Agent – just like Agent Bogdanski in the instant case – did not append any of the allegedly pornographic images to his warrant affidavit, and did not provide any description of the photographs.  Instead, "he merely asserted that they met the statutory definition of child pornography."  256 F.3d at 15-17.  The court held that probable cause was lacking, and rejected the lower court's reliance on the agent's training and experience in determining that the photographs contained child pornography.  United States v. Syphers, 426 F.3d 461 (1st Cir. 2005), cert. denied, 547 U.S. 1158 (2006), is also on point.  In that case, the warrant application did not append images previously seized or describe the physiological features of the persons depicted in those images.  The court declined to decide the probable cause issue – instead finding that the good faith exception to the exclusionary rule applied – but stated:

> The best practice is for an applicant seeking a warrant based on images of alleged child pornography to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently whether they probably depict real children. An officer who fails to follow this approach without good reason faces a substantial risk that the application for a warrant will not establish probable cause.[5]

Id. at 467. Accord, United States v. Battershell, 457 F.3d 1048, 1051 (9th Cir. 2006) (conclusory statement that picture depicted young female naked in a bathtub insufficient to establish lascivious exhibition of genitals or pubic area); United States v. Christie, 570 F.Supp.2d 657, 688-89 (D.N.J. 2008) (law enforcement must provide a "factual description of the images").

Similarly, in United States v. Jasorka, then-Chief Judge Sifton in the Eastern District of New York found that an affidavit submitted by a U.S. Customs Agent (like Agent Bogdanski) which stated that certain parcels contained "pornographic photographs of male children displaying a lewd and lascivious exhibition of the genitals and pubic areas" did not establish probable cause. The photographs had not been shown to the magistrate judge and the description of the photographs was not sufficiently detailed to permit a finding that they involved lascivious conduct. 153 F.3d at 59-60. The Second Circuit sidestepped the probable cause issue. Although it did not reverse or even question the district court's no probable cause finding, it upheld the search based on the good faith exception to the exclusionary rule. Id. at 61. In short, the district court's decision in Jasorka is still good law on the issue of probable cause.

Under the authority of this Court's decision in Genin, and in light of the persuasive reasoning of Brunette, Syphers, Battershell, and the district court in Jasorka, the warrant affidavit here clearly failed to establish probable cause because it neither appended the images claimed to

---

[5] The issue in Syphers was more whether the images depicted minors rather than whether they depicted sexually explicit conduct. 426 F.3d at 465.

contain child pornography nor provided a reasonably detailed description of what was depicted in those images.  Indeed, the warrant application here is actually worse in terms of probable cause than the warrant applications in Jasorka and Brunette.  In those cases, the affidavits at least focused on the fifth category of sexually explicit conduct – lascivious exhibition – but failed to establish probable cause because there was no description and no images attached for the magistrate judge to consider and make his or her own judgment.  In the instant case, the affidavit does not focus on any particular category – it just labels the images "child pornography" in one grand sweep.  Thus, the magistrate judge could not have even known which category was involved, much less why the images constituted child pornography (or, for that matter, who concluded it was child pornography or what were that person's qualifications).[6]

There are additional reasons why this warrant application lacked probable cause.  Agent Bogdanski does not say whether he personally reviewed the images, and the reference to "ICE agents" who investigated and arrested the California Perpetrator, seized his computer, and found the online chats between Perpetrator and "picluverinusa," suggests that it was the ICE agents in California who viewed the images, not Bogdanski.  Therefore, the affiant who appeared before the magistrate judge would not have been able to answer any questions from the judge as to the basis for his conclusion that the images contained child pornography.  United States v. Genin, 594 F.Supp.2d at 423 n.7.  Moreover, the affidavit contains no information about Bogdanski's credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of his fellow ICE agents, with respect to the determination of what types of images or

---

[6]  Syphers and Battershell considered state court warrant applications that did not specifically invoke the federal definition of child pornography.

-13-

materials constitute child pornography.  It is bad enough that the affidavit contains the conclusory statement that the images contain child pornography.  What makes it worse is that the magistrate judge had no basis to conclude that whoever came to that conclusion was qualified to do so.

Further, the affidavit is bereft of any evidence that "picluverinusa" had any interest in child pornography or any history of receiving or possessing child pornography.  All it says is that "picluverinusa" communicated on two occasions with Perpetrator via the Google Hello instant messaging program.  Of course, there is nothing inherently illegal about the Google Hello program, and the fact that Perpetrator used it for unlawful purposes does not tend to establish that "picluverinusa" also used it for unlawful purposes.  See Ybarra v. Illinois, 444 U.S. 85, 91 (1979) ("mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person").  The only comment attributed to "picluverinusa" during these two chats is that "he/she liked 'anything young and cute no age prefs.'" (Exh. B, ¶ 10(a)).  "Young and cute" and "no age prefs" are not necessarily references to child pornography.  "Young and cute" could refer to someone who is 18 or even 21 years of age. An image of an 18 year old engaged in sexually explicit conduct would not be child pornography.  Nor would an image of a minor engaged in conduct other than sexually explicit conduct.  See 18 U.S.C. § 2256(1) ("minor" is a person under 18 years of age); 18 U.S.C. § 2256(8) (child pornography by definition involves the depiction of a minor engaged in prohibited activity).  And "no age prefs" on its face means no age preferences; in other words, no preference for any particular age or even a preference that the person depicted be under 18.

Finally, the link between the images exchanged in the chatroom and the place to be searched – Mr. Groezinger's home – is weak.  The affidavit states that the username

-14-

"picluverinusa" was associated with the email address picluver@yahoo.com based on Google

records; that the email address or the username (it is not clear which) was accessed via a Comcast

Internet connection using the IP address 67.189.184.170; and that the same IP address was

assigned to an Internet account in Mr. Groezinger's name at his Patterson home address during

the relevant time period.  (Exh. B, ¶¶ 11-12).  Notably, however, the Google records produced in

discovery do <u>not</u> show that "picluverinusa" accessed the Internet on the two dates that Perpetrator

allegedly communicated with "picluverinusa" – December 21, 2007, and January 19, 2008.

(Exh. D).  Moreover, the email address associated with "picluverinusa" – picluver@yahoo.com –

is subscribed to by someone calling himself "Mr pic luver" with a Catskill, New York, address.

On its face, that person is not Mr. Groezinger, and Catskill is not where Mr. Groezinger lives.

It is hard to imagine a warrant application with less probable cause than this one.  The

Court should so find.  The search of Mr. Groezinger's home was therefore unlawful and the

exclusionary rule requires that the items seized be suppressed.  <u>Wong Sun v. United States</u>, 371

U.S. 471, 485 (1963); <u>Weeks v. United States</u>, 232 U.S. 383, 398 (1914).

C.      <u>The Good Faith Exception Does Not Apply</u>

The Supreme Court has held that the exclusionary rule does not apply to evidence seized

"in objectively reasonable reliance on" a warrant issued by a detached and neutral magistrate

judge, even if the warrant is later determined to be invalid.  <u>United States v. Leon</u>, 468 U.S. 897,

922 (1984); <u>accord</u>, <u>United States v. Falso</u>, 544 F.3d 110 (2d Cir. 2008).  The "good faith"

exception, however, does not apply in the following circumstances:

> (1) where the issuing [judge] has been knowingly misled; (2) where the issuing [judge] wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient [such as by failing to particularize the place to be searched or the things to be seized] that reliance upon it is unreasonable.

United States v. Falso, 544 F.3d at 125 (quotations omitted); United States v. Moore, 968 F.2d 216, 222 (2d Cir. 1992).  In such circumstances, it would not be objectively reasonable to rely upon the legal judgment of the issuing judge.  Importantly, it is the government's burden to demonstrate the objective reasonableness of the agents' reliance on the warrant's issuance. United States v. George, 975 F.2d 72, 77 (2d Cir. 1992).

      1.    The Indicia of Probable Cause Was Sorely Lacking

As detailed in the foregoing section, the indicia of probable cause in the agent's application was so lacking that reliance upon it was unreasonable.  Or, more precisely, the government cannot carry its burden to show that the agents' reliance was objectively reasonable. Agent Bogdanski's affidavit neither appends nor provides any description of the images contained in the Internet chats found in the California Perpetrator's computer.  Rather, the affidavit contains the bare conclusion that many of the images "contain child pornography."  The affidavit does not even say whether Agent Bogdanski personally viewed the images seized from Perpetrator, and contains no information about his credentials, qualifications, training or expertise or the credentials, qualifications, training or expertise of his fellow ICE agents, with respect to the determination of what types of images or materials constitute child pornography. The affidavit contains no evidence whatsoever that "picluverinusa" had any interest in child pornography or any history of receiving or possessing child pornography.  And the affidavit's

evidence linking these images to the place to be searched – Mr. Groezinger's home – is extremely weak.

Upon this showing, probable cause was woefully lacking.  The magistrate judge could not possibly have made a detached and neutral assessment of probable cause when so little information as to the images or their links to the defendant's home was provided.  Reliance on the warrant was therefore unreasonable.

It is important to note that in a child pornography case in which probable cause turns on what is depicted in seized images, the requirement that the affiant append the images to the warrant affidavit or provide a reasonably detailed description of what is depicted in the images is not novel, in this Circuit or elsewhere.  In United States v. Jasorka – decided more than ten years before the warrant application in this case was submitted to Magistrate Judge Smith – the Second Circuit certainly did not approve a warrant application submitted by a U.S. Customs Service agent that failed to append or describe the images, and did not hold that Chief Judge Sifton was wrong in concluding that the magistrate judge "lacked a sufficient basis to conclude that the intercepted materials" contained child pornography.  153 F.3d at 59.  Rather, the court skipped over the probable cause issue and went straight to the question of whether the agents acted in good faith.  It found good faith because the magistrate judge was not knowingly or recklessly misled and did not abdicate her judicial duty, and because the search warrant itself was not facially deficient.  The court did not address the question of whether the warrant application was so lacking in indicia of probable cause as to render reliance upon it unreasonable.  But the good faith question should not even be reached unless the warrant is deemed invalid.  United States v. Leon, 468 U.S. at 922.  For some reason, the Second Circuit avoided giving explicit guidance to

the lower courts and to law enforcement officials on this issue.  But the point is that, although the Second Circuit "saved" the search on good faith grounds, rather than probable cause grounds, no one reading that opinion could conclude that it was perfectly okay to fail to append or provide a detailed description of images said to contain child pornography.  The district court's decision to the contrary is still good law.

Moreover, the First Circuit's decision in United States v. Brunette – decided more than seven years before the submission of the warrant application in this case – could not be more on point.  First of all, Brunette, like Jasorka, is a Customs case.  In Brunette, the agent stated that the images all appeared to be within the statutory definition of child pornography, including photographs of a pre-pubescent boy lasciviously displaying his genitals.  256 F.3d at 15.  The court explicitly rejected the argument that it was permissible for the magistrate judge to rely on the training and expertise of the agent, without actually viewing the images or being given a detailed description of what was depicted.  Id. at 18.  The court then considered the good faith question, and concluded that the state of the law in cases of this sort was unclear at the time of the warrant application.  The court also stated: "Having now resolved this point, we would, in the future, view quite differently an agent's choice to withhold photos from a judicial officer."  Id. at 20.  That pronouncement was made in 2001.

In 2003, the criminal investigative arm of the Customs Service was combined with the investigative arm of the Immigration and Naturalization Service to become ICE, a part of the Department of Homeland Security.[7]  Agent Bogdanski, the affiant in this case, states in his affidavit that he has been employed as a special agent with ICE for thirteen years, that his "duties

---

[7]  See http://en.wikipedia.org/wiki/United_States_Customs_Service.

-18-

include the investigation of matters involving the sexual exploitation of children via computers and the Internet," and that he has "participated in the execution of search warrants at numerous locations." (Exh. B, ¶ 1). The agent also states that he has "received training in computer crime investigation" (Exh. B, ¶ 6), and has "had both training and experience in the investigation of crimes that involve, in part, the use of a computer." (Exh. B, ¶ 7). The affidavit also includes a detailed description of how computer technology and the Internet are used for the production, distribution, and storage of, as well as communication about, child pornography. (Exh. B, ¶¶ 17-18). Finally, Agent Bogdanski provides a detailed explanation about the uniqueness of "the staleness determination" in child pornography cases, with citations to four different published federal circuit court of appeals decisions, from the First, Second, Eighth, and Ninth Circuits, as well as a district court opinion from the Northern District of New York. (Exh. B, ¶ 20). The affiant thus displays a familiarity with relevant case law, and not just from the Second Circuit.

There is no question that Agent Bogdanski is a veteran agent with long experience investigating computer crimes in general and child pornography cases in particular.[8] His experience as an ICE special agent stretches back to well before the Jasorka and Brunette cases were decided – in courts (such as the First and Second Circuits) with which he is evidently quite familiar. Presumably, he was an agent for ICE's predecessor agency, the U.S. Customs Service, for eight years or so prior to the formation of ICE.[9] Notably, the agents whose affidavits were

---

[8] Although, as mentioned above, the affidavit contains no information regarding any particular credentials, qualifications, training or expertise Bogdanski had with respect to the determination of what types of images or materials constitute child pornography.

[9] Since ICE has only been in existence since 2003, and since Bogdanski says he has been an ICE special agent for 13 years (i.e., since 1995), he must mean that he was a Customs Service agent for the first 8 years of his career.

rejected by Chief Judge Sifton in <u>Jasorka</u> and by the First Circuit in <u>Brunette</u> were both fellow Customs agents.  Finally, Agent Bogdanski says he has extensive experience investigating child pornography cases, has received training in cases involving the use of computers, and has participated in the execution of numerous search warrants.

Based on the foregoing, the government cannot plausibly claim that Agent Bogdanski was not on notice of the <u>Jasorka</u> district court ruling, and more particularly the <u>Brunette</u> circuit court ruling, as to what is required for a search warrant affidavit to pass muster, when the probable cause determination is based primarily on whether particular images linked to a suspect's home or computer contain child pornography.  Agent Bogdanski even swore under oath that he is personally familiar with numerous published court opinions dealing with another aspect of the probable cause determination (staleness).  How can the government plausibly argue that he was familiar with those rulings – most of which were from outside the Second Circuit – but he was not familiar with the <u>Jasorka</u> and <u>Brunette</u> rulings?  And, if he did receive training in these areas, would not that training have included a discussion of what is required to establish probable cause in a child pornography case?  If his training did not include that topic, it should have.  After all, as this Court observed in <u>Genin</u>, the "oft-repeated principle [here is] that a magistrate's 'action cannot be a mere ratification of the bare conclusions of others,' nor a proverbial 'rubber stamp for conclusions drawn by the police.'"  594 F.Supp.2d at 421 (citations omitted).  This is an important principle that would have been central to any training a Customs agent would have received.  And the Customs Service (and ICE) had to have been aware of published decisions in which their own warrants in child pornography cases were found to be lacking because they failed to attach the pertinent images or describe them in detail.

The warrant application here not only failed to follow the persuasive and prevailing law that is unmistakable in Jasorka and Brunette (as well as Syphers and Battershell), it actually goes in the opposite direction in presenting to the magistrate judge an affidavit that is less informative and descriptive than the affidavits in those cases.  What does this show?  It shows at a minimum a lackadaisical attitude about the extraordinarily important constitutional requirement that "no Warrants shall issue, but upon probable cause."  Can the government carry its burden to show good faith?  No, it cannot.

       2.     The Magistrate Judge Was Knowingly or Recklessly Misled

There is another important reason why the government cannot show that the agents' reliance on the  warrant's issuance was objectively reasonable – namely that the magistrate judge was "misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth."  United States v. Leon, 468 U.S. at 923.

Specifically, paragraph 10(b) of the warrant affidavit states: "On or about January 19, 2008, 'picluverinusa' again contacted the Perpetrator via instant messaging and, during the course of their chat, sent in excess of 15 images, which were subsequently recovered from the Perpetrator's computer and many of which contain child pornography."  This statement was false.  The proof that it was false can be found in two places.  First, the government's December 17, 2008, discovery letter makes available for inspection "[a]pproximately 26 images containing child pornography sent to picluverinusa from the California Perpetrator during the enclosed online chats."  (Exh. C, p. 2) (emphasis added).  The letter makes no reference to any images containing child pornography sent by "picluverinusa" to Perpetrator, despite the warrant affidavit's claim that "picluverinusa" sent in excess of 15 such images.  Second, defense counsel

has personally inspected <u>all</u> of the images contained in the online chats – both those sent by Perpetrator to "picluverinusa" and those sent by "picluverinusa" to Perpetrator. None of the images sent by "picluverinusa" to Perpetrator appears to contain child pornography. None of the images fits into the first four, more easily recognized categories of "sexually explicit conduct," and none of the images involves the exhibition (lascivious or otherwise) of the genitals or pubic area. 18 U.S.C. § 2256(2)(A)(i)-(v). (Briccetti aff., ¶ 5). The fact that "picluverinusa" did not send child pornography to Perpetrator is consistent with the government's discovery letter but is directly contrary to the agent's sworn statement in the warrant affidavit. Should the Court wish to confirm what defense counsel observed, it is of course free to do so.

This false statement was important. Paragraph 10(a) of the affidavit states that Perpetrator sent child pornographic images to "picluverinusa." If the affidavit had accurately stated that "picluverinusa" responded by sending images to Perpetrator that did <u>not</u> contain child pornography, then a fair conclusion might have been that "picluverinusa" had no interest in child pornography, did not possess such images, and destroyed or deleted whatever Perpetrator sent to him or her.[10] If that's all there was, the magistrate judge may well have found a lack of probable cause that the proscribed images sent by Perpetrator would be found in "picluverinusa's" computer, and thus not have issued the warrant. Indeed, the affidavit quotes "picluverinusa" as saying that he/she liked "anything young and cute no age prefs." On its face, this statement

---

[10]   Indeed, the government does <u>not</u> claim that Mr. Groezinger was in possession of any <u>saved</u> child pornographic images, either in hard copy or on his computer, or on any digital storage devices, compact or floppy discs, or the like. The December 17 discovery letter alleges only that deleted images and "internet cache image files" were found on Mr. Groezinger's computer and thumbdrive. (Exh. C, p. 2). Even the one image allegedly found on the hard drive the government subsequently obtained from the former tenant, William Mitchell, was found in the "unallocated (not in use) memory space." (Exh. F).

certainly does not refer to child pornography – it could refer to pictures of 18 year olds or it could refer to images of minors that do not depict "sexually explicit conduct" as that term is defined in the statute. But when that statement is read in conjunction with the very next sentence – that "picluverinusa" sent more than 15 child pornographic images to Perpetrator – it makes it seem like "picluverinusa" is a collector of child pornography. The whole tone and import of the affidavit was changed by the inclusion of the false statement about what "picluverinusa" sent to Perpetrator.

This was no inadvertent mistake. At a minimum, it was a reckless falsehood, because no reasonable person who has read the statutory definition – and certainly no agent who professes to have years of experience investigating child pornography cases – could think that any of the images sent by "picluverinusa" to Perpetrator during these online chats depicted sexually explicit conduct. Indeed, either the agent deliberately misled the magistrate judge, which one would hope is not the case, or the agent did not bother to inspect the images or read the statute. Either way, the government cannot possibly establish good faith reliance on the issuance of the warrant.[11]

---

[11]   The importance of attaching or at least describing the allegedly proscribed images could not be better illustrated by what happened here. It turns out that the images sent by "picluverinusa" to Perpetrator were not child pornography. But because they were neither attached nor described, the magistrate judge did not know that and, in effect, merely ratified the affiant's bare conclusions. This the law does not permit. Illinois v. Gates, 462 U.S. 213, 239 (1983).

There is a second statement in the affidavit which is seriously misleading.  In paragraph 11, the agent states that "[r]ecords maintained by Google show that the username "picluverinusa" was associated with the email address "picluver@yahoo.com", which was accessed via a Comcast internet connection using the IP address 67.189.184.170."  Paragraph 12 states that Comcast records show that the Internet access account utilizing the same IP address was assigned to Mr. Groezinger at his home address from November 5, 2007, through March 5, 2008, which includes the dates on which the online chats allegedly occurred.  But the Google records do not show any access on the two key dates – December 21, 2007, and January 19, 2008 (the dates when picluverinusa and Perpetrator allegedly exchanged child pornography).  This fact was not shared with the magistrate judge.  Indeed, the first "access" date listed in the Google records is January 15, 2008, which is several weeks after the first alleged chat between Perpetrator and "picluverinusa" on December 21, 2007.  As to the second alleged chat on January 19, 2008, the Google records do show access before and after January 19, 2008, but not on January 19, 2008. (Exh. D).

Again, the magistrate judge was at least recklessly misled.  The affidavit was artfully drafted to make it appear that the government had documentary proof that "picluverinusa" – i.e., Mr. Groezinger – communicated in online chats with Perpetrator on the two key dates.  But there is no such documentary evidence.  The link between the chats and Mr. Groezinger is actually weaker than it seemed to the magistrate judge based on the affidavit.

As Chief Judge Jacobs so eloquently put it:

> An executing officer can hardly claim good-faith reliance on a warrant
> issued by a judge who was mis-directed by the officer himself: the same principle
> explains why, at a magic show, the credulity of the audience does not cause the
> magician to fear that the lady has been sawn in half.

United States v. Falso, 544 F.3d at 136 (Jacobs, C.J., dissenting).

The bottom line is that the government cannot carry its burden to establish the agents'
objectively reasonable reliance on the issuance of the warrant. The warrant affidavit was
woefully lacking in indicia of probable cause, and it contained knowingly or recklessly false
statements. The exclusionary rule requires that the evidence seized from Mr. Groezinger's home
and computer be suppressed.

### POINT II

### MR. GROEZINGER'S STATEMENTS SHOULD BE SUPPRESSED
### AS THE FRUIT OF THE POISONOUS TREE
### AND FOR VIOLATION OF HIS *MIRANDA* RIGHTS

In the December 17, 2008, discovery letter, the government made disclosure of one
statement attributed to Mr. Groezinger. The letter states that "[a]t the time of the search, the
defendant told [the] agents, in substance, that he had gotten rid of his old computer because 'the
motherboard fried.'" (Exh. C, p. 2). The government has also provided in discovery a redacted
ICE report summarizing additional statements allegedly made by Mr. Groezinger, including the
statement that he had discarded his old computer because the "motherboard had 'fried.'" (Exh.
E). During the course of his interview by ICE agents, Mr. Groezinger provided the names of the
tenants in his basement apartment. (Exh. E). The government later interviewed one of the
tenants (William Mitchell), and obtained from him a Maxtor computer hard drive that Mr.

-25-

Mitchell said he had received from Mr. Groezinger after Mr. Groezinger "had problems with the motherboard."  By letter dated January 20, 2009, the government alleged that one image containing child pornography was found on that hard drive, along with documents related to Mr. Groezinger's law practice.  (Exh. F).

The facts regarding Mr. Groezinger's interview are set forth in his accompanying affidavit: On Monday, September 8, 2008, at approximately 6:00 a.m., several federal agents came to the door of Mr. Groezinger's home.  They said they had a warrant to search the premises, and he allowed them into his house.  Initially, the agents placed Mr. Groezinger in the living room while they secured the premises.  They would not let him go to his bedroom to get dressed. The agents then retrieved some clothes from his bedroom and allowed him to get dressed.  At that point, the agents placed him in the kitchen and told him to sit down.  (Groezinger aff., ¶ 2).

During the entire time that the agents were in Mr. Groezinger's house, there were at least two agents with him in the kitchen.  The agents were armed although they did not brandish their weapons.  The agents were positioned so as to block his access to both of the archways leading out of the kitchen to other rooms in the house.  He got up once or twice and was told to sit down. In order to get up to make coffee, he had to ask the agents' permission.  (Groezinger aff., ¶ 3).

The agents questioned Mr. Groezinger while he was in the kitchen.  The questioning continued for at least half an hour.  At no time did the agents tell him that he had a right to remain silent, that anything he said could be used against him in court, that he had a right to consult with an attorney and to have that attorney present during questioning, and that if he could not afford an attorney one would be provided at no cost to represent him.  At no time did the

agents tell Mr. Groezinger that he was free to leave.  Nor did they ever give him an opportunity to leave.  (Groezinger aff., ¶ 4).

At some point, the agents asked if Mr. Groezinger would consent to a search of his car, which was in the driveway.  He did consent to such a search.  The agents accompanied him outside of the house.  In the driveway Mr. Groezinger saw three or four unmarked cars lined up directly behind and blocking his car.  If he had wanted to, he could not have driven his car away from the house.  (Groezinger aff., ¶ 5).

A short while after the agents entered Mr. Groezinger's house, he told them that he was an attorney and that he had a court appearance that morning in the Southern District.  The agents asked if the court was in White Plains.  Mr. Groezinger said no, it was in Foley Square, and that he needed to make a 7:00 a.m. train from Patterson in order to be in court on time.   The agents replied, in substance, that he was going to be late.  (Groezinger aff., ¶ 6).

After the agents told Mr. Groezinger he was going to be late for his court appearance, he did not ask again whether he could leave.  He knew that he was not free to leave, and in fact he expected to be formally arrested.  After about an hour and a half, the agents finished searching and left the house.  (Groezinger aff., ¶ 7).

The statements Mr. Groezinger made to the agents during the search of his home must be suppressed on two grounds: (1) the statements were the "fruit of the poisonous tree"; and (2) the statements were the product of custodial interrogation and the agents failed to provide the familiar Miranda warnings.

A.     The Statements Were the "Fruit of the Poisonous Tree"

Where there has been an illegal search and seizure, the exclusionary rule bars the introduction of statements derived or resulting therefrom.  Wong Sun v. United States, 371 U.S. 471, 484-87 (1963); United States v. Pena, 961 F.2d 333, 338 (2d Cir. 1992), see also United States v. Santa, 180 F.3d 20, 25 (2d Cir.), cert. denied, 528 U.S. 943 (1999); United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992), cert. denied, 510 U.S. 1045 (1994).  The question is whether "the evidence . . . has been come at by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint."  Wong Sun v. United States, 371 U.S. at 488.

Here, all the statements Mr. Groezinger made to the agents – from the moment they arrived at his front door – were the fruit of the illegally obtained search warrant.  The agents came to Mr. Groezinger's home for the purpose of executing the search warrant, not because they wanted to interview Mr. Groezinger.  The agents conducted the interrogation of Mr. Groezinger simultaneously with the illegal search.  Thus, had the agents not obtained the defective warrant and conducted the illegal search, Mr. Groezinger would not have made the statements he now seeks to suppress.  Under Wong Sun, those statements must all be suppressed.

B.     The Statements Were Taken in Violation of *Miranda*

Under Miranda v. Arizona, 384 U.S. 436, 467-73 (1966), any statement stemming from the custodial interrogation of a suspect is presumed involuntary and thus inadmissible unless the following warnings are given: that the suspect has a constitutional right to remain silent, that anything he says can and will be used against him, that he has a right to confer with an attorney

and to have the attorney present during any questioning, and that if he cannot afford an attorney one will be appointed for him.

Here, there is no question that Mr. Groezinger was questioned and that no <u>Miranda</u> warnings were given. Thus, the only question is whether Mr. Groezinger was in custody at the time of the interrogation.

The Second Circuit has recently held that the "test for custody is an objective one: 'whether a reasonable person in defendant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest.'" <u>United States v. Newton</u>, 369 F.3d 659, 671 (2d Cir.), <u>cert. denied</u>, 543 U.S. 947 (2004) (quoting <u>United States v. Ali</u>, 68 F.3d 1468, 1472 (2d Cir. 1995)). In making that determination, a court must consider "'the totality of all the surrounding circumstances.'" <u>United States v. Ruggles</u>, 70 F.3d 262, 264-65 (2d Cir. 1995) (quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 226 (1973)), <u>cert. denied</u>, 516 U.S. 1182 (1996).

In <u>Newton</u>, the court explained that the custody analysis must begin "by asking whether a reasonable person would have thought he was free to leave." If the answer is no, the court must next determine "whether a reasonable person would have understood his <u>freedom of action</u> to have been <u>curtailed</u> to a degree associated with a formal arrest." 369 F.3d at 672 (emphasis added).

Moreover, the "focus is on the facts known to the seized suspect and whether a reasonable person would have understood his situation was comparable to a formal arrest." <u>Id</u>. at 675. In other words, what the agents "understood" is irrelevant to the inquiry, and the fact that the agents had not made a formal arrest is also irrelevant to the inquiry. The only thing that

matters is whether a reasonable person in the shoes of the suspect understood that "his situation" was "comparable" to a formal arrest.  Presumably, a reasonable person is one who applies common sense to an assessment of "his situation."

Mr. Groezinger reasonably believed he was not free to leave for the following reasons: Several armed law enforcement officers were in his house executing a search warrant.  He was not allowed to get dressed on his own, and then he was told to remain seated in the kitchen with at least two agents with him at all times.  At no time did the agents tell him he was free to leave, and they did not give him an opportunity to leave.  The agents were positioned so as to block his access to both of the archways leading out of the kitchen.  When he got up he was told to sit down.  He had to ask permission to make coffee.  In the driveway, there were three or four unmarked cars lined up directly behind and blocking his car.  He could not have driven away from his house.  Shortly after the agents entered, Mr. Groezinger told them he needed to make a train in order not to be late to a court appearance in lower Manhattan.  The agents replied that he was going to be late.  Mr. Groezinger did not ask again if he could leave, because he knew he was not free to leave.  In fact, he expected to be formally arrested, although as it turns out he was not arrested that day.

Applying the principles of Newton to these facts, there is no question that Mr. Groezinger was in custody when he was being interrogated by the ICE agents.  Would a reasonable person in Mr. Groezinger's position have thought he was free to leave?  No way.  Was his freedom of action curtailed to a degree associated with a formal arrest?  Absolutely.  There was nothing unreasonable about the extent to which Mr. Groezinger was restrained.  But the reasonableness of the restraint is irrelevant to this inquiry.  United States v. Newton, 369 F.3d at 673.  What

-30-

matters is whether a reasonable person would have thought he was free to leave the police encounter.  No reasonable person would have thought that.  And what also matters is whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with a formal arrest.  No reasonable person would have thought otherwise.

Accordingly, Mr. Groezinger was in custody when he was questioned by the ICE agents.  Mr. Groezinger was not given the familiar <u>Miranda</u> warnings.  The statements he made must be suppressed.

**POINT III**

**THE PHYSICAL EVIDENCE OBTAINED FROM<br>
MR. GROEZINGER'S FORMER TENANT SHOULD BE<br>
<u>SUPPRESSED AS THE FRUIT OF THE POISONOUS TREE</u>**

As noted above, the government claims that  "[a]t the time of the search, the defendant told agents, in substance, that he had gotten rid of his old computer because 'the motherboard fried.'" (Exh. C, p. 2).  The government also claims that during the course of that interview, Mr. Groezinger provided the names of the tenants in his basement apartment.  (Exh. E).  The government later interviewed one of the tenants (William Mitchell), and obtained from him a Maxtor computer hard drive that Mr. Mitchell said he had received from Mr. Groezinger after Mr. Groezinger "had problems with the motherboard."  By letter dated January 20, 2009, the government alleges that one image containing child pornography was found on that hard drive, along with documents related to Mr. Groezinger's law practice.  (Exh. F).

The physical evidence the government obtained from Mr. Mitchell must also be suppressed as the "fruit of the poisonous tree."  <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-87 (1963). The question is whether "the evidence . . . has been come at by exploitation of the

-31-

illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

Wong Sun v. United States, 371 U.S. at 488.

In this case, the government learned about both the existence of the discarded hard drive and about the tenants in the basement apartment from Mr. Groezinger, during an interview during the course of the search.  Since the search was based on an unlawfully obtained search warrant, Mr. Groezinger's statements are the "fruit of the poisonous tree" and must be suppressed.  Likewise, the information about the discarded hard drive and the tenants, since it was directly derived from the unlawful search, is also tainted and must be suppressed.  The agents would never have learned about or obtained the hard drive had it not been for the illegally obtained search warrant.  Everything flowing therefrom must be suppressed under Wong Sun.

## POINT IV

### THE GOVERNMENT SHOULD BE REQUIRED TO MAKE DISCLOSURE PURSUANT TO BRADY v. MARYLAND

If the government possesses any reports or summaries indicating that any of the images found (i) on the California Perpetrator's computer that were allegedly sent to or received from "picluverinusa," (ii) on the computer and thumbdrive seized from Mr. Groezinger's home, or (iii) on the hard drive retrieved from William Mitchell, do not contain child pornography, those reports or summaries would constitute Brady material and should be disclosed.  Even if there are no reports or summaries, the government should be ordered to identify any such images that do not contain child pornography.

The government of course recognizes its obligation to disclose evidence favorable to the accused when it is material to guilt or punishment.  Brady v. Maryland, 373 U.S. 83, 87 (1963).  This duty covers not only exculpatory information but also information that could be used to impeach government witnesses.  Giglio v. United States, 405 U.S. 150 (1972).  However, the disclosure has to be sufficient for defense counsel to be able to make "effective use" of it, United States v. Coppa, 267 F.3d 132, 142 (2d Cir. 2001), and not be denied access to exculpatory information known only to the government.  United States v. LeRoy, 687 F.2d 610, 619 (2d Cir. 1982), cert. denied, 459 U.S. 1174 (1983).

In this case, the images sent by "picluverinusa" to Perpetrator did not contain child pornography, and all of the allegedly proscribed images found during the search were either deleted or found in "internet cache image files."  Even the image found on the Mitchell hard drive was found in the "unallocated (not in use) memory space."  None of the images was "saved" to a file or folder or disc.  Based on these facts, a defense of lack of knowing receipt or possession may be asserted.  To the extent there are images either exchanged between "picluverinusa" and Perpetrator, or seized during the search or obtained from William Mitchell, that do not contain child pornography, those images may tend to establish this defense.  Those images are not readily available to the defense because the government has retained possession of the digital media on which they were found.  Under the circumstances, the government should be ordered to disclose the existence and location of such images.

## POINT V

### THE COURT SHOULD DIRECT THE GOVERNMENT TO
### MAKE CERTAIN PRETRIAL DISCLOSURES

The defense cannot adequately prepare for trial unless the government produces a witness list, an exhibit list, witness statements and impeachment material, and a detailed description of any Rule 404(b) evidence it intends to offer.  These items are all "material to preparing the defense."  Fed. R. Crim. P. 16(a)(1)(E)(i).  Moreover, all of these requests are calculated to facilitate the orderly presentation of evidence and avoid unnecessary delays at trial.  In addition, the government should be directed to certify when it has completed its discovery disclosures.

A.  Witness List

This Court clearly has the discretion to order the government to produce a witness list. United States v. Cannone, 528 F.2d 296, 299 (2d Cir. 1975).  Some of the factors the courts have considered in determining whether to exercise this discretion are (i) whether the indictment charges only non-violent offenses and the defendant does not have a criminal record involving crimes of violence, (ii) whether the trial will largely involve testimony relating to documents, (iii) whether production of the witnesses' names will not likely lead to the witnesses' failure to appear at trial, and (iv) whether the indictment alleges offenses occurring over an extended period of time.  United States v. Turkish, 458 F. Supp. 874, 881 (S.D.N.Y. 1978), aff'd, 623 F.2d 769 (2d Cir. 1980), cert. denied, 449 U.S. 1077 (1981); accord, United States v. Cannone, 528 F.2d at 300; United States v. Earls, 2004 WL 350725, at *9 (S.D.N.Y. 2004); United States v. Falkowitz, 214 F.Supp.2d 365, 395 (S.D.N.Y. 2002); United States v. Rueb, 2001 WL 96177, at *7 (S.D.N.Y. 2001).

-34-

Most of these factors argue in favor of requiring a witness list here.  Moreover, it would be no burden on the government to identify its witnesses before trial, and it would serve only to "level the playing field" in this case, not give some sort of improper advantage to the defense.

As in United States v. Falkowitz, supra, the Court should direct the government to provide a witness list thirty days before trial.

B.  Exhibit List

Moreover, the Court can and should order the government to identify its trial exhibits well in advance of trial.  United States v. Earls, 2004 WL 350725 at *9; United States v. Falkowitz, 214 F.Supp.2d at 391;  United States v. Turkish, 458 F. Supp. at 881.  The Court should direct the government to provide an exhibit list before trial that identifies the exhibits by description and Bates-number (or, if there is no Bates-number, by some other identifying characteristic).

C.  Witness Statements and Impeachment Material

As to witness statements and impeachment material (Jencks, 18 U.S.C. § 3500, Giglio), it is understood that the Court cannot compel the government to make production of Jencks/3500 material prior to trial.  However, the Court does have "the authority to determine, as a matter of sound case management, when the Government shall disclose Brady and Giglio material." United States v. Morales, 280 F.Supp.2d 263, 275 (S.D.N.Y. 2002).  Accord, United States v. Madrid, 302 F.Supp.2d 187, 193 (S.D.N.Y. 2003).  Typically, Giglio material is inextricably intertwined with Jencks/3500 material.  Moreover, under Rule 611(a) the Federal Rules of Evidence, the Court has wide discretion over the mode and order of proof at trial.  This is relevant here because in the event the defendant has insufficient time to read, digest, and follow-

-35-

up on the <u>Jencks</u> and <u>Giglio</u> material for particular witnesses prior to their testimony at trial, the Court would have the authority to delay cross-examination of these witnesses, or direct that they be re-called at a later date.

Under the circumstances of this case, if witness statements and impeachment material are not provided substantially before trial, the defense will <u>not</u>, at least with respect to some of the witnesses, have sufficient time to read, digest, and follow-up on the material before cross-examining those witnesses.  In that event, the defense may have no choice but to move pursuant to Rule 611 either to continue the testimony of government witnesses or to re-call them.  If, on the other hand, the witness statements and impeachment material are provided well before trial, no such motion should be necessary.

D.  <u>Rule 404(b) Evidence</u>

As to Rule 404(b) (similar act) evidence, the government is required to "provide reasonable notice in advance of trial . . . of the general nature of any such evidence it intends to introduce at trial."  That notice period should be at least thirty days, if not more.  <u>United States v. Reddy</u>, 190 F.Supp.2d 558, 576-77 (S.D.N.Y. 2002) (government conceded that thirty days notice was reasonable; court ordered forty-five days notice);  <u>United States v. Nachamie</u>, 91 F.Supp.2d 565, 577 (S.D.N.Y. 2000) (one month notice ordered).  In fact, the government should be directed to provide such notice as soon as it determines what 404(b) evidence, if any, it will seek to introduce, but not later than 45 days before trial, in case the defense needs to investigate such evidence.

E.   Completeness of Discovery

Finally, the Court should direct the government to confirm when discovery is complete. Too often, discovery is provided much later than Rule 16 contemplates, and frequently continues up to and during trial.  Such belated disclosure clearly compromises the defendant's right to a fair trial and to adequate time and notice in order to prepare his defense.  Further, the government knows when additional material is expected.  It is not too much to require the government to confirm that all such material is in hand and all discovery has been made before the case is deemed ready for trial.

## CONCLUSION

For all the foregoing reasons, defendant Robert Groezinger's pretrial motions should be granted.

Dated:  White Plains, NY
       March 23, 2009

                                         BRICCETTI, CALHOUN & LAWRENCE, LLP

                          By:   S/
                                   Vincent L. Briccetti (VB 3285)
                                   81 Main Street, Suite 450
                                   White Plains, NY  10601
                                   (914) 946-5900

                                   *ATTORNEYS FOR DEFENDANT*
                                   *ROBERT GROEZINGER*

To:   Anna M. Skotko, Esq.
       Assistant United States Attorney
       300 Quarropas Street
       White Plains, NY 10601